### EGAN *v.* BERKSHIRE APARTMENT ASS'N.

*(Common Pleas of New York City and County, General Term.* June 2, 1890.)

NEGLIGENCE—DANGEROUS PREMISES—ELEVATORS.

Plaintiff's intestate went to defendant's apartment house to visit a servant of one of the tenants, and entered an elevator used for carrying freight and servants. In one side of the elevator was a slide, movable up and down, for the purpose of taking on baggage. While the elevator was ascending, intestate, either through faintness or loss of consciousness, sank to the floor, and fell through the slide, which was open. *Held,* that the accident was a misadventure for which defendant could not be held liable.

Exceptions from trial term.

Action by Dominick J. Egan, as administrator of Winifred Egan, against the Berkshire Apartment Association. The trial judge dismissed the complaint, and directed the exceptions heard in the first instance at general term.

Argued before LARREMORE, C. J., and BOOKSTAVER, J.

*Goff & Pollock,* for plaintiff. *Albert Stickney* and *Samuel H. Ordway,* for defendant.

LARREMORE, C. J. This action is to recover $5,000 damages, under the statute, for alleged negligence resulting in the death of plaintiff's intestate. The facts testified to by plaintiff's witnesses, and which must be taken

as established for the purposes of this appeal, are as follows: Plaintiff's intestate went to the Berkshire apartment house to pay a friendly visit to a domestic servant in the employ of one of the tenants. She entered an elevator which was used for the carrying of baggage and freight, as well as of conveying servants employed in the house, to the upper stories. The sides of this elevator were of wire, and in one side was a slide, which was movable up and down, for the purpose of taking on baggage. When said intestate stepped into the elevator, and when the accident happened, this slide was up. There also extended from the ground floor to a height of several feet, but not quite up to the second floor, a wire screen or cage, of the same mesh, and in all respects similar to, the wire forming the elevator sides, the object of which was to protect persons from falling into the elevator shaft. Just under the ceiling of the first floor, and above where the wire cage stopped, and between it and the staircase, there was an open space by the side of the elevator shaft. Plaintiff's principal witness gives this description of the accident: "I don't remember that I heard anybody else cry or shout, or make any noise, besides myself. I must have been pretty excited. I suppose the thing that first excited me was seeing her fall. All that I saw at the time the thing occurred,—I saw her fall. I saw her fall inside under the slide. That is all I could see. She didn't fall exactly down. She fell more backward,—towards the back of the elevator; and then I saw her fall outside, at the side, underneath the slide that raised up and down." A mysterious feature of the casualty is that, although the elevator fits quite closely in its shaft, there being only a space of a very few inches between the side of the shaft and the side of the elevator, the deceased did not fall on the staircase outside, but was found lying dead at the bottom of the shaft. The only possible explanation of the intestate's being able to get out of the elevator at all is that when she fell the open slide of the elevator was abreast of the opening in the shaft just under the second floor. Plaintiff's witness aforesaid caught at her clothing in an effort to save her, and apparently held onto her dress after she had got into the open space outside. Presumably this was the cause, while the elevator kept moving up, of the intestate's being drawn back within the elevator shaft. The evidence is undisputed that her remains were found at the bottom of such shaft.

Such facts as are shown convince me that the deceased originally fell down inside the elevator through vertigo, fainting, or loss of consciousness. The reason attempted to be assigned on the trial for such fall is most improbable. The witness above referred to, Katie Egan, on this point, said: "As far as I saw, the fur of her cloak caught in the outside wire; and, as the elevator moved up, it drew her backward." It seems impossible that fur of any quality or kind, even if it did catch upon, or become entangled in, the wire netting, could adhere thereto with sufficient tenacity to draw a woman backward off her feet, especially if another person grasped her clothing on the other side, and helped her to pull back. A careful analysis of the evidence also shows that the witness virtually abandoned this theory as to the cause of the mishap. Upon her cross-examination, she admitted that she had previously testified at the coroner's inquest that "she [the deceased] stumbled some, and Tony said to her: 'Be careful. The slide is up,'"—and further that she had said at the inquest: "It was as if her dress was caught in the wire." One of the present counsel for appellant appeared at the inquest, and put the question to the witness: "When you say she stumbled, you mean she was pulled back by her dress?" to which she answered, "No." This testimony at the inquest was obviously very different, as to the probable cause of the accident, from that given by the witness on her direct examination in the present trial. Before the coroner, she not only neglected to say that the deceased was pulled back by her dress, but she directly refused to give that explanation, though it was suggested by a leading question. The witness further testified that the facts as related by her at the inquest, a month or two after the

accident, were as she remembered them then; that her recollection then was fully as good, and might be clearer, than at the time of the present trial; that she was no exception to the rule that persons remember events better when they are fresh than when they are two or three years old.   The only fair construction of her evidence as a whole is that, whenever her testimony at the trial conflicted with that at the inquest, she intended that the latter should prevail, and she was to be considered as now testifying to the facts as she had formerly stated them.   Accepting this view, the theory that the decedent was pulled out of the elevator, by the catching and adhering of the fur on her cloak to the wire cage is left without foundation.   In fact, the only possible hypothesis the admitted facts will support is that, either through faintness or loss of consciousness, she stumbled, and sank to the floor of the elevator, while it was ascending.   It is in evidence that she had been sick a few weeks before this time, and also that she did not utter a cry or any sound when she fell.   Having fallen thus, in some inexplicable manner,—perhaps by the momentum from the fall,—she rolled out through the slide into the opening in the shaft, and, being dragged back through Miss Egan's mistaken zeal in holding fast to her dress, fell to the bottom.   The only alleged act of negligence on the part of defendant was in leaving the slide open.   Even if the elevator had been constructed without a slide, but with a permanent opening in the side, I should not have considered such form of construction, in itself, sufficient to make out a *prima facie* case of negligence.   The accident was not only unexampled, it was one which, if it had not actually happened, would seem physically impossible.   We think the trial judge correctly held that plaintiff's case disclosed no facts which would authorize a finding of negligence, and correctly ruled in dismissing the complaint at that stage.

The following language of ANDREWS, J., in *Loftus* v. *Ferry Co.*, 84 N. Y. 455, forcibly states the legal principles which we conceive are applicable to the present case: "The rule does not impose upon the defendant the duty of so providing for the safety of passengers that they shall encounter no possible danger, and meet with no casualty, in the use of appliances provided by it.   It was possible for the defendant so to have constructed the guard that such an accident as this could not have happened; and this, so far as appears, could not have been done without unreasonable expense or trouble.   If the defendant ought to have foreseen that such an accident might happen, or if such an accident could reasonably have been anticipated, the omission to provide against it would be actionable negligence.   But the facts rebut any inference of negligence on this ground.   The company had the experience of years certifying to the sufficiency of the guard.   That it was possible for a child, or even a man, to get through the opening, was apparent enough.   But that this was likely to occur was negatived by the fact that multitudes of persons had passed over the bridge without the occurrence of such a casualty." Again in *Lafflin* v. *Railroad Co.*, 106 N. Y. 136, 12 N. E. Rep. 599, Judge EARL remarks that "no structure is ever so made that it may not be made safer.   But, as a general rule, when an appliance or machine or structure not obviously dangerous has been in daily use for years, and has uniformly proved adequate, safe, and convenient, its use may be continued without the imputation of culpable imprudence or carelessness."

We think the motion for a new trial should be denied for defendant, and we could not better sum up the reasons for our conclusion than by employing the final words of Judge EARL's opinion in the case last cited: "A careful consideration, therefore, of the whole case, as it appears in this record, has led up to the conclusion that the defendant is not legally responsible for the accident which befell the plaintiff.   It was a misadventure, and no rule of law will permit her to charge the misfortune, in whole or in part, to the defendant."