## Crane Company v. Amiela Sobkowicz.

### Gen. No. 12,952.

1. ELEVATOR—*duty of owner of, to licensee.* The duty of the owner of an elevator to one using it not by invitation but at most as a mere licensee, is to refrain from wilful or affirmative injurious acts.

Action in case for personal injuries. Appeal from the Superior Court of Cook county; the Hon. ARTHUR H. FROST, Judge, presiding. Heard in this court at the March term, 1906. Reversed. Opinion filed January 21, 1907.

Statement by the Court. The appellee sued appellant for damages alleged to have been occasioned by her fall from an elevator, by reason of appellant's negligence. It is averred in the original declaration in substance, as follows: Defendant occupied a building for the manufacture of machinery, on the east side of Canal street, at the intersection of said street with 13th street, in the city of Chicago, and a certain elevator ran from the ground floor to the 2nd and 3rd stories of said building, which was used to transport persons from the ground floor to the 2nd and 3rd floors of the building.

January 25, 1900, defendant desired to employ a servant in its said business, and invited plaintiff to come to the 3rd floor of the building, to secure employment as such servant. Plaintiff, in response to said invitation, went to said building and got on said elevator, and was being transported between the 1st and 3rd floors of the building. The elevator ran through a shaft, one side of which was open and unguarded, and it was defendant's duty to guard the same so as to prevent persons on said elevator from falling into the shaft; but defendant neglected said duty, and left one side of the elevator entirely open; and while plaintiff was riding on the elevator, between the 1st and 3rd floors of the building, and was exercising ordinary care for her safety, the defendant negligently caused the elevator to jerk and jolt, by reason of which plaintiff was suddenly and unavoidably thrown from the elevator and fell through the unguarded part of the shaft to the ground floor, and divers bones in her hands were fractured and broken, etc.

The defendant pleaded the general issue. At the close of the plaintiff's evidence the court, on plaintiff's motion, permitted the plaintiff to amend her declaration, against defendant's objection and exception, and overruled defendant's motion, supported by affidavit, for a continuance, and ordered that the general issue, originally pleaded, should stand as a plea to the declaration, as amended.

The amendment alleges, as negligence, the leaving the elevator cage, adjacent to the alleged open and unguarded side of the shaft, open and unguarded.

The jury found for the plaintiff, and assessed her damages at the sum of $10,000, and the court, on the hearing of defendant's motion for a new trial, announced that the motion would be granted unless the plaintiff would remit $4,000 from the damages assessed, which the plaintiff did, and the court over-

ruled defendant's motion for a new trial and in arrest of judgment and entered judgment for $6,000.

The building in which the elevator is, is six stories high, and the elevator ran to the sixth floor. As the accident occurred between the ground floor and the second main floor, it will not be necessary to consider the conditions above the second floor. We will first call attention to the character of the elevator. It was a freight elevator. Victor Flodin, a machinist in defendant's employ, testified that the elevator was in good condition both before and after the accident, and that the elevator had not been changed in any way since the accident. He also identified, and defendant put in evidence, a certificate of inspection, of date March 7, 1905, signed "A. P. Pumely, elevator inspector," and "George Williams, Commissioner of Buildings." It is certified by the certificate, that, March 7, 1905, the elevator was inspected, that the kind of power was direct gear steam; also, "condition of elevator and machinery good." This evidence was uncontradicted. Thomas W. Smith testified: "I am chief engineer of the Crane Company and have charge of all the mechanical work in the buildings. I am acquainted with the elevator in question and have examined it carefully. On the 25th day of January last it was in good condition. The jerky motion in starting the elevator is due to all engines of that construction, for the simple reason that it is a direct gear elevator, a small pinion into an internal gear, and there isn't a sufficient balance wheel, or the momentum of the engine is not sufficient to keep up the lost motion. When the elevator runs fast you wouldn't find that jerky motion. This motion occurs in going slow and starting and is caused by the pinion working in the internal gear, the lost motion between the teeth in the gear. The cogs are about an inch and a quarter apart, between the cogs, about two-inch centers. It is a play between the teeth of the cog wheels. That is where that motion comes from and occurs when the

elevator is starting or going slow.   There is no way of obviating that.   This is a type in general use in mines and especially in buildings, and is used most frequently for freight.''

The elevator floor was eight feet by ten feet, and would carry from fifteen to twenty persons, and would carry safely a load of 5,000 pounds, as appears from the inspector's certificate above mentioned.   The longer part of the elevator lay north and south, and the entrance to it at the first floor was on the east side. On the west side of the elevator shaft, where the accident occurred, there was a wall which extended to about six feet above the first floor.   At the termination of this wall, about six feet above the first floor, and between the first and second floors, there was a deck or halfway floor, for means of access to which there was an opening in the wall about four feet high. The floor of the elevator, when on a level with the halfway floor, is about two inches from the floor. Hagemeyer, who was operating the elevator at the time of the accident, testified that there was a bar on the west side of the elevator reaching from its south to its north wall, and about three and one-half feet above the elevator floor, and it was so attached to the north and south sides of the elevator, that when necessary to put freight on the half floor (for which that floor was used), it could be removed out of the way by raising up one end of it.   A sworn statement of Hagemeyer, made on the day of the accident, was put in evidence, in which he says:   ''I put down the bar and started the elevator upward.''   Edward Wright, an employe of the defendant, testified that, at the time of the accident, he examined the elevator car, for the purpose of ascertaining how plaintiff could have fallen from the elevator and that he found a bar on the west side of the car about three feet six inches from the bottom.   Thomas W. Smith testified that his orders were to use the bar, and that he never

found it out of place except once, two years before the accident.

Two witnesses, who were on the elevator when the accident occurred, testified, in rebuttal, that they saw no bar there; but the same witnesses testified that they did not see the accident, which occurred at the west side of the elevator, where the bar was.

There was a stairway back of and close to the elevator, in plain sight. As to why plaintiff went to the building and rode on the elevator, and the accident, she testified, in substance, that on each of two successive days she went to the building and ascended by the elevator to the fourth floor, and there applied to a forewoman in charge of some hired girls for work, and that, on each occasion, the forewoman told her to call the next day, and she went to the building the third day and took the elevator, intending to go to the fourth floor, when the accident occurred. At the time of the accident there were only five persons on the elevator, the elevator man, plaintiff, and three other girls. In respect to the accident plaintiff testified: "There was a man on the elevator. I went first, other girls after me. There were four girls, including myself. I stood, at that time, on the middle of the elevator, on the other side where the man was who operated the elevator. When the other girls came there I moved a little. After that the elevator jerked then, and went up, second time jerked, and somehow I fell backwards. What happened to me then I don't know." She further testified: "I remember nothing about falling into a doorway about six feet up and losing my hat and falling from there to the ground below. All that I remember is that I got on the elevator that was going up. I didn't know that I fell in a doorway, or that I stepped in a doorway backwards while the elevator was going up. I fell when the elevator was going up. I don't know whether the floor of the elevator touched me after I fell. I don't remember when the elevator was between the second and

third floors. I fell backwards. The elevator jerked up, and sideways. I know that it jerked. I can't remember now whether it was sideways or up." * * * "It was still when I got on, and when it started it jerked once; after I got on the elevator and stood there, it started up."

Apparently, she attributes her fall to the jerking motion of the elevator to which she testifies. Miss Otten, the forewoman on the fourth floor of the building testified that plaintiff and other girls were there Monday and Tuesday; that plaintiff never spoke to her about work, and that she did not tell her, or any of the girls, to come back Wednesday (which was the third day); also, that she did not tell plaintiff to use the elevator. She also testified that girls coming to look for work used the elevator.

The testimony of witnesses other than the plaintiff, including that of plaintiff's witnesses, tends to corroborate the testimony of Thomas W. Smith, defendant's chief engineer, as to the motion of the elevator. Tony Hosek and Mary Papisz, two of the girls who were on the elevator at the time of the accident, were called as witnesses by plaintiff. Tony Hosek testified that the elevator started up and jerked some, she didn't know how many times; that she had ridden on it a good many times, and it always started with that jerky motion, and that was the way with all freight elevators as she understood.

Mary Papisz testified: "When the elevator was going up, it jerked some * * * The elevator always moved with this jerky motion, just the same as it did that day * * * The elevator always shook that way. * * * With reference to the elevator always jerking the same, when it is going up, it jerks—shakes. It didn't jerk me off my feet. Nothing at all happened to direct my attention, except when I heard that Nellie had fallen; before that I had noticed nothing different about the elevator than ordinarily."

Hagemeyer, the elevator man, testified: "There was no sudden jerk there, when I started, or afterwards."

Neither the elevator man, nor either of the two girls who were on the elevator at the time of the accident, and who testified, saw the plaintiff fall from the elevator. Her fall seems to have been discovered by them merely by her absence from the elevator, so far as appears from the evidence. Tony Hosek testified that she didn't see her fall; that one of the girls called "a girl fell off," and she called to the elevator man, and he stopped the elevator. Mary Papisz testified that she did not see plaintiff fall. Hagemeyer testified that the first thing which called his attention to anything unusual was, when the girl hallooed, "Oh," and one of them said "a girl fell off." Only two of the girls who were on the elevator with the plaintiff testified; the third girl, Nellie Kuc, did not appear as a witness, nor was her absence accounted for.

After the accident the elevator was stopped at the second floor, and the elevator man left his passengers there till he could go to the basement another way to learn what had happened. The plaintiff was found at the bottom of the shaft, in the basement.

RUSSELL M. WING, FRED M. WING and FRED W. BENTLEY, for appellant.

DAVID K. TONE, H. M. ASHTON and DANIEL BELASCO, for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

The first question presented by the record is, what duty, if any, did the defendant owe to the plaintiff. The plaintiff testified that on Tuesday, when she was on the fourth floor of the building the second time, Miss Otten, the forewoman, told her to return the next day. This is expressly denied by Miss Otten.

The plaintiff does not claim that she was told by Miss Otten, or any one, to use the elevator, and Miss Otten expressly says, that, on the second occasion, when plaintiff was there, the plaintiff did not speak to her about work; that she told the girls she had no work, and did not tell them to come back the next day, and did not tell plaintiff to use the elevator. Therefore, so far as appears from the evidence, plaintiff was not invited to ride on the elevator, but did so voluntarily and for her own convenience. It was not necessary for her to go to the fourth floor by the elevator. There was a stairway back of the elevator, in plain view, by which she could have ascended to the fourth floor. Miss Otten, called by plaintiff, testified that there was a stairway back of the elevator, and any one could see it, and also what kind of elevator it was; also, that she had nothing to do with the girls who came there till they applied for work at her room, and then it was her duty to say whether she wanted them or not. It is true that Miss Otten testified that girls looking for work had come up to her floor by the elevator; but this, certainly, could not have operated as an invitation to plaintiff to take the elevator. She testified, at the trial, which occurred in January, 1906, that she was nineteen years of age, so that, at the time of the accident, she was about eighteen years of age, and old enough to know the difference between a passenger and a freight elevator. We are of opinion that the plaintiff, in using the elevator, was not using it by invitation, and that she was, at the utmost, a mere licensee, and as such, the sole duty which defendant owed her was to refrain from wilful or affirmative injurious acts toward her. Gibson v. Leonard, 143 Ill. 182, 189. See, also, as to the duty of the owner of premises to persons on the premises by mere permission and without invitation: Gibson P. & Co. v. Sziepienski, 37 Ill. App. 601; Chicago & Aurora S. & R. Co. v. Collins, 43 ib. 478; Bentley v. Loverock, 102 ib. 166; Parker v. Portland, 69 Me. 173, 176, et seq.

In Gibson v. Leonard, *supra,* the plaintiff, a member of a fire patrol, entered the defendant's building to, extinguish a fire therein. While on an elevator in the building, the rope which held up the counterweight of the elevator broke and the counterweight fell on his leg and injured it so that it had to be amputated. The court held that he had license by law to enter the building, for the purpose aforesaid; but there having been means of access other than the elevator to the place in the building, where his services were required, there was no implied license or invitation for him to use the elevator; and the court affirmed the judgment of the trial court for the defendant.

The evidence is conclusive that the accident occurred at the halfway floor between the first and second floors. The physical facts are such that it could not have occurred at any other place on the west side of the elevator shaft. The accident happened on the west side of the elevator, and between the first and second floors, and the west side of the shaft was a continuous wall from the basement to the second floor and above that floor, with the exception of an opening four feet in height at the halfway floor, and the space between the elevator and the west wall, and between the elevator floor and the halfway floor, when it and the elevator floor were on the same plane, was only two inches. Necessarily, therefore, the plaintiff could only have gotten into the elevator shaft between the first and second floors, without getting partly, at least onto the halfway floor, and falling thence into the shaft. Her hat was found on the halfway floor.

In Egan v. Berkshire Department Ass'n, 10 N. Y. Supplement, 116, the accident was quite similar to that in this case, and the court, Larremore, C. J., delivering the opinion, says: "Such facts as are shown convince me that the deceased originally fell down inside the elevator through vertigo, fainting or loss of

consciousness;" and it was held that there could be no recovery.

The evidence of Smith, quoted in the preceding statement, is, that the elevator, at the time of the accident, was in good condition, that it was of a kind most frequently used for freight, that whatever jerky motion it had is common to all elevators of its construction, and that this motion only occurs when it is being started, or is running slowly, and that there is no way of obviating this. It is also the uncontradicted evidence, that, at the time in question, there was no unusual motion of the elevator, and that the elevator could not jerk sideways more than three-sixteenths of an inch, because of the guides on its sides.

Plaintiff, on the two days next before the day of the accident, had ascended in the elevator to the fourth floor twice and descended from it twice. Therefore, she had ample opportunity to become acquainted with its motion. The two girls, Tony Hosek and Mary Papisz, testified that, on the day of the accident, there was no unusual motion of the elevator, and Mary Papisz testified that nothing happened to attract her attention till she heard the plaintiff had fallen. Neither of these two girls experienced any mishap or inconvenience from the motion of the elevator, and, if plaintiff was in a normal condition, physically and mentally, and in the exercise of ordinary care for her safety, it is difficult, if not impossible, to suppose that she could have been thrown down by the motion of the elevator described by the witnesses.

We cannot concur in the contention of plaintiff, that the accident was caused by defendant's negligence as charged in the declaration. Our conclusion is, that the accident was a mishap and without fault on defendant's part.

The judgment will be reversed.

*Reversed.*